## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## AIKEN DIVISION

| | |
|---|---|
| The United States of America, )<br><br>Plaintiff, )<br><br>vs. )<br><br>CB&I AREVA MOX Services, LLC, and )<br>Wise Services, Inc., )<br><br>Defendants. )<br>_____ ) | **CA No.**: ___1:19-444-TLW___<br><br><br>**JURY TRIAL REQUESTED** |

## <u>UNITED STATES' COMPLAINT</u>

The United States of America, for its complaint and by its attorneys, alleges as follows:

**I.     INTRODUCTION**

1.     The United States brings this action to recover losses from false or fraudulent claims submitted by defendants CB&I AREVA MOX Services, LLC (MOX) and Wise Services, Inc. (Wise) and for treble damages and penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, for civil penalties under the Anti-Kickback Act, 41 U.S.C. §§ 8710-8707, and for relief under the common law theories of unjust enrichment, breach of contract, and payment by mistake.

2.     Defendants MOX and Wise made and used numerous false records and statements material to the United States National Nuclear Security Administration (NNSA), and knowingly, falsely, and fraudulently billed, or caused to be billed, the NNSA for millions of dollars in unallowable costs and fees included in Defendants' false and fraudulent claims. Specifically, Defendants MOX and Wise knowingly submitted, or caused to be submitted, to the

NNSA hundreds of false and fraudulent claims, supported by forged and fraudulent invoices, for construction related materials that did not exist.

3.      Additionally, Defendants' false and fraudulent claims to NNSA included improper kickbacks that Wise paid to MOX in order to obtain and reward favorable treatment from MOX, in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707.

## II.    JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 -3733, the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707, and common law.  This Court has subject matter jurisdiction pursuant to 31 U.S.C. §§ 3732(a) and 28 U.S.C. §§ 1331, 1345 and 1355.

5.      This Court has personal jurisdiction over the Defendants because the Defendants conducted business in the District of South Carolina, because MOX had its principal place of business in the District of South Carolina, because MOX and Wise made and used false statements from within, and to a federal agency located in, the District of South Carolina, and because many of the prohibited acts committed by the Defendants occurred within the District of South Carolina.

6.      Venue is proper in this district under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because MOX and Wise did business in this district, and at least one of the acts proscribed by 31 U.S.C. § 3729 occurred in this district.

## III.    STATUTE OF LIMITATIONS

7.      MOX and Wise executed tolling agreements with the United States that tolled the running of the statute of limitations from June 1, 2016 until January 15, 2019  As a result of the Defendants' failure to disclose the fraudulent activity alleged herein, the United States officials

2

charged with the responsibility to act in the circumstances did not know nor should have known the facts material to any right of action any earlier than January 2015, and the United States believes it is probable that the date is later.

### IV.     THE PARTIES

8.      Plaintiff in this action is the United States of America.

9.      The United States brings this action on behalf of the NNSA and the United States Department of Energy (DOE).  The NNSA is a semi-autonomous agency within DOE responsible for the management and security of the nation's nuclear weapons, nuclear nonproliferation, and naval reactor programs.  NNSA manages a program for the long-term disposition of weapons-grade plutonium by converting the materials to nuclear fuel for use in commercial reactors.  As part of this program, NNSA administered the design, construction, and operation of the Mixed Oxide Fuel Fabrication Facility (MOX Project) at the Savannah River Site in Aiken, South Carolina.

10.      Defendant MOX is a South Carolina limited liability company with a principal place of business in Aiken, South Carolina.  MOX is a private company that was established specifically to build the MOX Project.  MOX performs this work pursuant to a contract with NNSA.  MOX does not spend any of its own money in executing its contractual obligations for the MOX Project. MOX submits claims to NNSA for all of its costs on the MOX Project, including any costs related to subcontracts that MOX enters with vendors like defendant Wise.

11.      Defendant Wise is an Ohio corporation with a principal place of business in Dayton, Ohio.  Wise is a small business contractor formed in 1993 to work on construction labor

3

projects at a DOE facility in Ohio.  In 2008, MOX hired Wise as a subcontractor to perform

work at DOE's Savannah River Site facility in Aiken, South Carolina.

12.     Phillip Thompson was Wise's Senior Site Representative for the MOX Project.

During all times relevant to this Complaint, Thompson acted with actual and apparent authority

to act on behalf of Wise and represented Wise with respect to all activities at the MOX Project

and under subcontracts between Wise and MOX.  At all relevant times, Thompson had both

apparent and actual authority to act on behalf of Wise in carrying out, and acquiring the

knowledge of, the activities set forth in this Complaint.  In 2017, Thompson plead guilty to

charges of a criminal conspiracy to defraud the United States related to the same fraud scheme

alleged in this Complaint.

## V.    RELEVANT STATUTORY, REGULATORY, AND CONTRACTUAL BACKGROUND

### The False Claims Act

13.     The False Claims Act establishes liability for the following:

    a.     any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1) (through May 19, 2009), or any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)(A) (after May 19, 2009); and

    b.     any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B).

14.     The term "knowingly" under the False Claims Act means that a person, with

respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate

4

ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth

or falsity of the information.  31 U.S.C. § 3729(b)(1).  No proof of specific intent to defraud is

required to show that a person acted knowingly under the False Claims Act.  31 U.S.C. § 3729(b)

(through May 19, 2009); 31 U.S.C. § 3729(b)(1)(B) (after May 19, 2009).

15.     The False Claims Act, 31 U.S.C. § 3729(a)(1),  provides for recovery of three

times the damages sustained by the United States ("treble damages") plus a civil penalty for each

violation of the Act.

### The Anti-Kickback Act

16.     The Anti-Kickback Act was enacted by Congress and amended in 1986 to fight a

specific type of corruption that Congress believed had become "rampant" and "nationwide" by

1986: commercial bribery in which contractors or their employees provide things of value to

other contractors or their employees in return for favorable treatment on government contracts

and subcontracts.  *See* H.R. Rep. No. 99-964, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 5960,

5963.  Kickbacks, Congress found, not only undermined the integrity of the federal procurement

process through the obvious and clear conflicts of interest that they created, but increased the

cost of goods and services to the taxpayer because the amount of such kickbacks was invariably

included in the amounts charged to the government.  *Id.*

17.     The Anti-Kickback Act, 41 U.S.C. §§ 8701-8707, provides that "[a] person may

not (1) provide, attempt to provide, or offer to provide a kickback; (2) solicit, accept, or attempt

to accept a kickback; or (3) include the amount of a kickback prohibited by paragraph (1) or (2)

in the contract price — (A) a subcontractor charges a prime contractor or a higher tier

subcontractor; or (B)  a prime contractor charges the Federal Government."  41 U.S.C. § 8702.

18.     The Anti-Kickback Act defines a "kickback" as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract."  41 U.S.C. § 8701.

19.     A person or entity that knowingly pays or receives a kickback, or includes the amount of a kickback in subcontract or contract charges, is liable to the United States for twice the amount of the kickback, plus additional penalties for each kickback.  41 U.S.C. § 8706.

**The Federal Acquisition Regulation**

20.     The Federal Acquisition Regulation (FAR), 48 C.F.R. Part 1, requires, in relevant part, that "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none.  Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct."  48 C.F.R. §3.101-1.

21.     FAR §9.505 contains requirements regarding organizational conflicts of interest, which are defined generally as situations in which a contractor or subcontractor either: (1) has an unfair competitive advantage in agency contracting or subcontracting; or (2) is placed in a situation that might bias its work for the federal agency.

22.     The FAR also incorporates the Anti-Kickback Act's prohibitions on providing or receiving anything of value in an effort to receive, obtain, or reward favorable treatment on a government contract or subcontract.  48 C.F.R. §§ 3.502-1 – 3.502-3.

23.     The FAR requires that government contracting officers, and prime contractors like MOX, must "purchase supplies and services from responsible sources at fair and reasonable prices." 48 C.F.R. § 15-402(a).

24.     Under the FAR, MOX was entitled to seek and receive payment only for those costs that were allowable, allocable, and reasonable under applicable-cost-reimbursement principles and compliant with contract requirements. 48 C.F.R. § 31.201-2.

25.     A contractor such as MOX bears the burden of establishing that the costs for which it claims payment from NNSA, including the costs of subcontractors such as Wise, are allowable, allocable, and reasonable. 48 C.F.R. § 52.216-7; 48 C.F.R. § 31.201-2; 48 C.F.R. § 52.242-3.

26.     A contractor such as MOX that requests reimbursement for unallowable or unreasonable costs is subject not only to disallowance of the unallowable or unreasonable costs, but to penalties. 48 C.F.R. § 52.216-7; 48 C.F.R. § 31.201-2; 48 C.F.R. § 52.242-3.

27.     If a contractor such as MOX becomes aware that the Government has overpaid on a contract or invoice payment, the contractor must remit the overpayment amount to the Government. The contractor may be suspended and/or debarred for knowing failure by a principal to timely disclose credible evidence of a significant overpayment. 48 C.F.R. § 3.1003(a)(3).

### Relevant Contract Provisions

**The MOX Project Contract**

28.     The United States, acting through DOE, originally constructed the Savannah River Site (SRS) to produce basic materials used for nuclear weapon fabrication. The primary

nuclear materials produced at SRS were tritium and plutonium.  During the 1950s and 1960s, five reactors and several supporting facilities were built, and production of these materials began.

29.    In 1991, production of nuclear materials for weapons at the SRS stopped and the focus shifted to the safe disposal of surplus radioactive material, in particular, surplus plutonium. In addition to the radioactive material already located at the SRS, there was a growing surplus of plutonium from dismantled nuclear weapons outside of the United States.

30.    On March 22, 1999, the NNSA entered into a contract with MOX to design, build and operate the MOX Project (the MOX Project Contract or Contract).  The MOX Project Contract number is DE-AC02-99CH10888.

31.    The MOX Project was designed to convert surplus nuclear weapons-grade plutonium into safe, stable fuel for civilian nuclear power generation, known as MOX fuel.

32.    In 2000, the United States and the Russian Federation committed to each dispose of at least 34 metric tons of surplus plutonium, sufficient for approximately 8,500 nuclear weapons per country. A protocol signed in 2010 updated the agreement to specify that the plutonium be converted to MOX fuel.

33.    The MOX Project Contract is a cost reimbursable contract, which means it obligated the NNSA to pay MOX for all of MOX's allowable costs.

34.    MOX performed many of the MOX Project Contract obligations through subcontractors.  The subcontractors invoiced MOX for any services and materials.  MOX then charged these subcontractor costs to NNSA in the form of MOX's invoices.

35.    One such subcontractor was Wise.  MOX entered into a series of time and materials subcontracts with Wise between 2008 and 2016.  These subcontracts called for Wise to

provide labor, material, equipment and supervision as required to perform unplanned construction activities, including procuring materials from suppliers for use on the MOX Project.

36.    The three relevant Wise subcontracts were: (1) 10888-B-2272 between April 1, 2008 and January 31, 2011 for approximately $25 million; (2) 10888-O-5370 between December 6, 2010 and March 31, 2014 for approximately $25 million; and (3) 10888-O-12061 between November 20, 2013 and September 30, 2016 for approximately $25 million (collectively Wise Subcontracts).

37.    The MOX Project Contract requires MOX to provide oversight of its subcontractors.  MOX is required under Section J of the MOX Project Contract to administer the award, implementation, and claims under all subcontracts.  MOX was also contractually obligated to ensure the development and implementation of management programs and procedures for subcontract procurements.   MOX submitted millions of dollars in claims to the NNSA under the MOX Project Contract to establish and administer a compliant procurement system to ensure proper prime contractor administration over subcontractor costs.

38.    Pursuant to the MOX Project Contract, the Wise Subcontracts, and FAR §52.244-2, MOX created a purchasing system and related procedures which were incorporated into MOX's contract obligations when administering subcontracts, such as the Wise Subcontracts.

39.    As part of its MOX Project Contract obligations, MOX created procedures outlining MOX's responsibilities for the approval and payment of subcontractor invoices.  These procedures included: (1) the Procurement Practices Manual (Procurement Manual); (2) the Subcontract Technical Representative Manual (STR Manual); (3) the PP10-16 Vendor Payment

Authorization Procedure (PP10-16); and (4) the PP10-16A Subcontractor Application and Certificate for Payment Form (PP10-16A).

40.     The MOX Procurement Manual applied to all of MOX's personnel with procurement authority and described the general principles and detailed procedures for the procurement of supplies, services, and construction by MOX's procurement personnel.

41.     The MOX Procurement Manual was adopted to provide effective control of subcontracts through: (1) effective implementation of subcontract terms and conditions; (2) effective subcontract oversight by MOX's procurement personnel; (3) accurate and timely reporting of subcontract performance; and (4) periodic audits to determine and ensure subcontract compliance.

42.     The MOX Procurement Manual instructed its personnel that they could not solicit or accept, either directly or indirectly, a bribe, kickback, commission, or any other illegal or improper payment or anything of value that might support an inference of wrongdoing regarding any subcontract.

43.     The MOX Procurement Manual required procurement personnel to conduct a review and approve each subcontractor invoice including associated support documentation (e.g., time sheet, material receipts, 3rd party costs, or travel vouchers). The review was to be documented on each Application and Certificate for Payment.  The review was required to be sufficient to show that the approved subcontractor cost was allowable and allocable to the MOX Project Contract.

44.     The MOX STR Manual provided the procedures by which MOX's Subcontractor Technical Representatives (STR) were to review and approve of subcontractor invoices.   The

10

STR Manual set forth the process for submittal and authorization of subcontractor payment requests so that these requests were properly reviewed, confirmed, authorized, and processed to ensure that costs claimed by subcontractors were allowable under the MOX Project Contract.

45.     The STR Manual made clear that MOX employees, "are expected to conduct all affairs under the highest standards of business ethics so that no business action, if fully investigated and publicized, could cause embarrassment to MOX, its clients, suppliers, the government or any other business associates."

46.     The STR Manual established that the MOX Control Account Manager was responsible for planning and managing resources for performing contract work, including subcontractors.  More specifically, the Control Account Manager was the primary MOX employee responsible for the integration of subcontractor work scope, budget, actual cost, and schedule, as well as the measurement of subcontractor performance.

47.     The STR Manual established that the MOX STR was responsible for coordinating the review and approval of all subcontractor invoices, confirming the necessity and receipt of all deliverables, and providing key input to the MOX Subcontract Administrator, Control Account Manager, project controls and accounting, and cost engineers.  The assigned STR was responsible for reviewing all subcontractor claims for payment to ensure that the materials and/or services invoiced "have been received and accepted."

48.     The STR Manual established that the MOX Subcontract Administrator was responsible for the award and administration of a subcontract.  As part of his/her duties, the Subcontract Administrator coordinated the receipt of subcontractor invoices, reviewed the

11

invoice for contractual compliance, forwarded the invoice to Accounts Payable for payment, and served as the individual authorized to award and administer any subcontracts and modifications.

49.    The MOX PP10-16 implemented procedures for the submittal and approval of subcontractor payment requests.  The PP10-16 applied to all requests for payment from MOX's subcontractors.  The PP10-16 was critically important to MOX's responsibility to ensure that only allowable costs from subcontractors were approved by MOX and submitted to NNSA for reimbursement.

50.    The PP10-16 required subcontractors to confer with the applicable STR prior to the submission of any claims to ensure that the work to be billed had been completed and accepted by the STR.   The subcontractor was then required to submit a request for payment form to the Subcontract Administrator.  The Subcontract Administrator was required to confirm that the subcontractor request for payment was compliant with the subcontract terms and conditions.  The Subcontract Administrator was then required to forward the request for payment for approval to the applicable STR.

51.    The PP10-16 required that, upon receipt of the subcontractor request for payment from the Subcontract Administrator, the applicable MOX STR review the subcontractor's request and confirm that the materials and/or services invoiced had actually been received at the MOX Project and met the requirements of the subcontract.  Pursuant to the requirements of the PP10-16, if the STR did not confirm that materials claimed by a subcontractor actually existed and had been delivered to the MOX Project, then the material costs claimed by the subcontractor could not be approved and could not be submitted to NNSA under the MOX Project Contract. The PP10-16 explicitly required that if a subcontractor's invoice contained costs for materials

12

that had not been received and accepted by MOX, then the subcontractor invoice could not be paid until MOX had, in fact, received and accepted all of the materials.

52.    The MOX PP10-16A was a Request for Payment form that required subcontractors to certify that the costs claims were consistent with the terms and conditions of the subcontract, including that the costs claimed for materials were allowable.  The PP10-16A form also required that the STR sign the document and certify that MOX had received all of the materials.

53.    Only after the receipt of a PP10-16A signed by the STR could the MOX Subcontract Administrator authorize the request and send it to MOX's accounting department for submission to the NNSA.

54.    In summary, pursuant to all of the contractually required MOX's subcontract procedures, MOX was obligated to confirm receipt and acceptance of any materials before MOX approved and submitted the claims to NNSA.

55.    The terms of the MOX Project Contract expressly included and incorporated the requirements of the Anti-Kickback Act.

**Wise Subcontracts**

56.    Under the terms of the Wise Subcontracts, Wise was only entitled to seek reimbursement for materials that met the requirements for allowable costs under FAR Part 31. This required, at a minimum, that the cost for materials charged to the subcontract actually existed.  In other words, under both the FAR and the express terms of the Wise Subcontracts, Wise was prohibited from claiming costs for non-existent materials.

13

57.    The Wise Subcontracts also required that for any material procured by Wise over a threshold that varied between $3,000 and $10,000, Wise was required to seek bids from at least two different sources to satisfy FAR competitive requirements.

58.    From 2008 until 2016, Phillip Thompson was Wise's Senior Site Representative for the MOX Project and the manager of the Wise Subcontracts.  Mr. Thompson had the actual and apparent authority on behalf of Wise to obligate Wise in connection with the Wise Subcontracts.  This included the authority to: sign modifications of the Wise Subcontracts; negotiate and accept task orders under the Wise Subcontracts; procure materials needed for the Wise Subcontracts; select suppliers of materials needed for the Wise Subcontracts; ensure receipt of materials from suppliers on the Wise Subcontracts; ensure delivery to the MOX Project of materials needed for the Wise Subcontracts; and submit claims to MOX on the Wise Subcontracts.

59.    The terms of the Wise Subcontracts expressly included and incorporated the requirements of the Anti-Kickback Act.

## VI.    WISE CAUSED THE SUBMISSION OF FALSE OR FRAUDULENT CLAIMS TO NNSA

### Wise Submitted to MOX Invoices for Non-Existent Materials

60.    Beginning in 2008 and continuing to 2016, Wise submitted a total of 484 claims to MOX under the Wise Subcontracts that were knowingly false and fraudulent because the claims included costs for non-existent materials.

61.    More specifically, Wise, acting through the actual and apparent authority of Mr. Thompson, submitted 484 claims to MOX that knowingly included charges for the costs of non-

existent materials and were claimed using forged invoices from the following suppliers: AV Securities; Ross Hardware; Carolina Sodding Services, LLC; Aiken Electrical Wholesalers, Inc.; Norton Welding Supply Company; and Mundy's Automotive, LLC.

62.    Each of the 484 claims submitted by Wise was false and fraudulent because it contained claimed costs for non-existent materials and were not allowable under the Wise Subcontracts and the MOX Contract. Each of the 484 claims submitted by Wise was also false and fraudulent because Wise added a 3 percent fee to the costs for the non-existent materials.

63.    For each of these claims, Wise knew that the materials were non-existent and the costs were unallowable.

64.    Wise knowingly submitted each of the 484 false and fraudulent claims to MOX knowing that MOX would present each claim to the NNSA for payment.

65.    AV Securities: between September 2010 and June 2015, Wise submitted claims to MOX under the Wise Subcontracts that included 1,454 forged and fraudulent invoices for material from AV Securities totaling $4,655,945.29. These invoices are specifically set forth and identified on Attachment 1 to this Complaint. Wise knew that these costs were false and fraudulent because they included claimed costs for materials that Wise knew were non-existent. Wise knew that these costs were not allowable under the terms of its subcontracts. Wise also added a 3 percent fee to the costs of the non-existent materials that it billed under the Wise Subcontracts. Wise knew that the 3 percent fee charges were false and fraudulent because the materials to which the fees applied were non-existent. For example, on or about August 14, 2010, Wise knowingly forged a false and fraudulent invoice purporting to be from AV Securities, numbered 2976, in the total amount of $1,339.89. *See* Attachment 1, lines 9-13. On

15

August 23, 2010, Wise, in turn, knowingly submitted a false and fraudulent invoice, numbered 1117-0036-50, in the amount of $4,419.86 to MOX consisting of $1,339.89 of costs of non-existent materials. *Id*. On September 2, 2010, MOX then knowingly submitted a false and fraudulent voucher, numbered 142A, in the amount of $20,626,521.46, that claimed reimbursement consisting of $1,339.89 of costs of non-existent materials. *Id*. NNSA paid these claims.

66.    Ross Hardware: between July 2008 and February 2015, Wise submitted claims to MOX under the Wise Subcontracts that included 483 forged and fraudulent invoices for material from Ross Hardware totaling $1,433,414.17. These invoices are specifically set forth and identified on Attachment 2 to this Complaint. Wise knew that these costs were false and fraudulent because they included claimed costs for materials that Wise knew were non-existent. Wise knew that these costs were not allowable under the terms of its subcontracts. Wise also added a 3 percent fee to the costs of the non-existent materials that it billed under the Wise Subcontracts. Wise knew that the 3 percent fee charges were false and fraudulent because the materials to which the fees applied were non-existent. For example, on or about October 5, 2009, Wise knowingly forged a false and fraudulent invoice purporting to be from Ross Hardware, numbered 9337, in the total amount of $3,018.56. *See* Attachment 2, lines 391-395. On October 19, 2009, Wise, in turn, knowingly submitted a false and fraudulent invoice, numbered 1117-0027-30, in the amount of $30,542.88 to MOX consisting of $3,018.56 of costs of non-existent materials. *Id.* On November 3, 2009, MOX then knowingly submitted a false and fraudulent voucher, numbered 132A, in the amount of $11,797,599.50, that claimed

16

reimbursement consisting of $3,018.56 of costs of non-existent materials. *Id.* NNSA paid these claims.

67.     Norton Welding Supply Company: between February 2015 and May 2015, Wise submitted claims to MOX under the Wise Subcontracts that included 27 forged and fraudulent invoices for material from Norton Welding Supply Company totaling $90,991.70. These invoices are specifically set forth and identified on Attachment 3 to this Complaint. Wise knew that these costs were false and fraudulent because they included claimed costs for materials that Wise knew were non-existent. Wise knew that these costs were not allowable under the terms of its subcontracts. Wise also added a 3 percent fee to the costs of the non-existent materials that it billed under the Wise Subcontracts. Wise knew that the 3 percent fee charges were false and fraudulent because the materials to which the fees applied did not exist. For example, on or about January 16, 2015, Wise knowingly forged a false and fraudulent invoice purporting to be from Norton Welding Supply Company, numbered 10327, in the amount of $3,541.06. *See* Attachment 3, line 329. On February 16, 2015, Wise, in turn, knowingly submitted a false and fraudulent invoice, numbered 1120-0034-10, in the amount of $40,269.04 to MOX consisting of $3,541.06 of costs of non-existent materials. *Id.* On March 3, 2015, MOX then knowingly submitted a false and fraudulent voucher, numbered 196A, in the amount of $8,439,912.54, that claimed reimbursement consisting of $3,541.06 of costs of non-existent materials. *Id.* NNSA paid these claims.

68.     Carolina Sodding Services, LLC: between August 2013 and July 2014, Wise submitted claims to MOX under the Wise Subcontracts that included 21 forged and fraudulent invoices for material from Carolina Sodding Services, LLC totaling $52,881.20. These invoices

are specifically set forth and identified on Attachment 4 to this Complaint.  Wise knew that these costs were false and fraudulent because they included claimed costs for materials that Wise knew were non-existent.  Wise knew that these costs were not allowable under the terms of its subcontracts.   Wise also added a 3 percent fee to the costs of the non-existent materials that it billed under the Wise Subcontracts.  Wise knew that the 3 percent fee charges were false and fraudulent because the materials to which the fees applied did not exist.  For example, on or about August 14, 2013, Wise knowingly forged a false and fraudulent invoice purporting to be from Carolina Sodding Services, LLC, numbered 14330, in the total amount of $3,950.00.  *See* Attachment 4, lines 3-4.  On August 19, 2013, Wise, in turn, knowingly submitted a false and fraudulent invoice, numbered 1118-0038-24, in the amount of $30,400.69 to MOX consisting of $3,950.00 of costs of non-existent materials.  *Id.*  On September 18, 2013, MOX then knowingly submitted a false and fraudulent voucher, numbered 178B, in the amount of $20,989,751.37, that claimed reimbursement consisting of $3,950.00 of costs of non-existent materials.  *Id.*  NNSA paid these claims.

69.    Mundy's Automotive, LLC: between December 2014 and April 2015, Wise submitted claims to MOX under the Wise Subcontracts that included 6 forged and fraudulent invoices for material from Mundy's Automotive, LLC s totaling $11,567.51.  These invoices are specifically set forth and identified on Attachment 5 to this Complaint.  Wise knew that these costs were false and fraudulent because they included claimed costs for materials that Wise knew were non-existent.  Wise knew that these costs were not allowable under the terms of its subcontracts.  Wise also added a 3 percent fee to the costs of the non-existent materials that it billed under the Wise Subcontracts.  Wise knew that the 3 percent fee charges were false and

fraudulent because the materials to which the fees applied did not exist.  For example, on or about December 23, 2014, Wise knowingly forged a false and fraudulent invoice purporting to be from Mundy's Automotive, numbered 14723, in the total amount of $1,214.45.  *See* Attachment 5, line 101.  On January 5, 2015, Wise, in turn, knowingly submitted a false and fraudulent invoice, numbered 1120-0037-7, in the amount of $149,162.08 to MOX consisting of $1,214.45 of costs of non-existent materials.  *Id.*  On February 3, 2015, MOX then knowingly submitted a false and fraudulent voucher, numbered 195A, in the amount of $20,391,461.74, that claimed reimbursement consisting of $1,214.45 of costs of non-existent materials.  *Id.*  NNSA paid these claims.

70.     Aiken Electrical Wholesalers, Inc.: between March 2015 and April 2015, Wise submitted claims to MOX under the Wise Subcontracts that included four forged and fraudulent invoices for material from Aiken Electrical Wholesalers, Inc. totaling $13,633.83.  These invoices are specifically set forth and identified on Attachment 6 to this Complaint.  Wise knew that these costs were false and fraudulent because they included claimed costs for materials that Wise knew were non-existent.  Wise knew that these costs were not allowable under the terms of its subcontracts.   Wise also added a 3 percent fee to the costs of the non-existent materials that it billed under the Wise Subcontracts.  Wise knew that the 3 percent fee charges were false and fraudulent because the materials to which the fees applied did not exist.  For example, on or about January 24, 2015, Wise knowingly forged a false and fraudulent invoice purporting to be from Aiken Electrical Wholesalers, Inc., numbered PS206004, in the amount of $3,338.40.  *See* Attachment 6, line 645.   On April 13, 2015, Wise, in turn, knowingly submitted a false and fraudulent invoice, numbered 1120-0036-14, in the amount of $65,356.02 to MOX consisting of

$3,338.40 of costs of non-existent materials.  *Id.*  On May 1, 2015, MOX then knowingly submitted a false and fraudulent voucher, numbered 198A, in the amount of $8,155,986.60, that claimed reimbursement consisting of $3,338.40 of costs of non-existent materials.  *Id.*  NNSA paid these claims.

71.     Wise knowingly failed to meet the requirements of the Wise Subcontracts to ensure that the 1,995 supplier material invoices referenced in paragraphs 65 through 70 included materials required for the project that were actually provided to the MOX project.

72.     Wise knowingly failed to meet the requirements of the Wise Subcontracts to obtain competitive quotes from several suppliers to obtain the best price before procuring materials for use on the Wise Subcontracts.

73.     Additionally, Ross Hardware and AV Security supplied in excess of 30 percent of the total amount of materials associated with the Wise Subcontracts. Wise knowingly ignored red flags on the face of the Ross Hardware and AV Security invoices in that the invoices: (a) were hand-written, (b) did not include shipping fees, and (c) were non-local MOX Project suppliers that were located within 50 miles of Wise's home office in Dayton, Ohio.  The AV Security address listed on the invoices was connected to a residential address in Dayton, Ohio.

74.     Wise also knowingly authorized its Senior Site Representative, Mr. Thompson, to process an extraordinarily high amount of petty cash transactions with suppliers without taking any steps to obtain support for their validity, or to confirm that Wise had actually incurred the costs for materials.  Under this process, Mr. Thompson pretended that he had purchased millions of dollars of materials for the MOX Project using his own money and then purported to "reimburse" himself by writing checks to himself on the Wise petty cash account.  These

20

transactions were fraudulent because the materials were non-existent.  Mr. Thompson knew the materials were non-existent.  Despite this inherently suspicious and unorthodox procedure for material procurement, Wise did not receive any explanation from Mr. Thompson as to why materials purportedly required for the MOX Project had to be procured with petty cash as opposed to following standard procurement procedures required by the Wise Subcontracts. Wise did not request or receive any supporting materials from Mr. Thompson to justify these expenditures.  In total, Wise knowingly reimbursed Mr. Thompson by authorizing him to write checks to himself from a petty cash account, and then Wise submitted claims to MOX for the following purchases of non-existent materials: (1) 763 AV Security transactions totaling $2,311,467.98; (2) 347 Ross Hardware transactions totaling $1,106,817.49; (3) 27 Norton Welding transactions totaling $90,991.70; and (4) 4 Aiken Electric transactions totaling $13,633.83.

75.    Wise knew that its accounting records did not have proper controls to track and account for Mr. Thompson's petty cash transactions.

### Wise Paid Kickbacks to MOX and MOX Accepted Them

76.    As part of the scheme to defraud the United States, Wise knowingly paid kickbacks to various MOX officials and employees in order to improperly reward MOX and to obtain favorable treatment from MOX related to the award, modification, and administration of the Wise Subcontracts, as well as the payments of claims submitted on the Wise Subcontracts.

77.    Wise carefully chose the MOX officials and employees to whom it would improperly reward and pay kickbacks based upon their ability to provide favorable treatment to Wise in the award, modification, and administration of the Wise Subcontracts.   Wise, through its

designated Project Manager, Mr. Thompson, identified the key gatekeepers at MOX who were in

a position to award more business to Wise and who might otherwise detect the fraudulent

scheme.

78.     The MOX personnel who received kickbacks from Wise knew that the material

costs being claimed by Wise were not being properly evaluated and approved by MOX.  These

MOX officials also knew that the Wise invoices were being submitted by MOX to NNSA for

payment in violation of the requirements of the MOX Contract and the Wise Subcontracts.  The

MOX personnel receiving kickbacks from Wise also knew that no one at MOX was confirming

that the claimed materials actually existed, had been delivered to the SRS, or were needed for the

MOX Project.

79.     From 2013 through 2014, Wise paid kickbacks to MOX's officials totaling at

least $52,000.  These kickbacks consisted of things of value such as cash, gift cards, YETI

coolers, sunglasses, mobile phones, NASCAR tickets, Masters Golf Tournament tickets, college

football tickets, firearms, and hunting supplies.  These things of value from Wise to MOX were

kickbacks because they were provided by Wise, a subcontractor, to MOX, a prime contractor, to

improperly reward MOX and to obtain favorable treatment from MOX related to the award,

modification, and administration of the Wise Subcontracts.

80.     For example, MOX Subcontract Technical Representative Joe Yates was

responsible for the Wise Subcontracts beginning in 2013.  In that role, one of Mr. Yates'

responsibilities was to review, sign, and approve invoices submitted by Wise from a technical

perspective and confirm that any material claimed for reimbursement had been delivered for use

on the MOX Project and was of sufficient quality.  On numerous occasions, Mr. Yates signed and approved Wise invoices, including invoices for non-existent materials.

81.     From 2010 through 2015, Wise provided Mr. Yates with things of value in order to obtain favorable treatment from MOX.  Wise gave Mr. Yates a barbeque grill, car tires, hunting supplies, NASCAR tickets, a mobile phone, cash gift cards, a hunting rifle, a welding machine, and a YETI cooler.  Mr. Yates was acting within the scope of his actual and apparent authority for MOX when he received these gifts and performed his duties relating to the Wise Subcontracts.  The gifts provided to Mr. Yates by Wise were kickbacks prohibited by the Anti-Kickback Act.  Mr. Yates knew that these gifts were being provided by Wise to himself and other MOX officials in order to buy favor and trust from MOX.  Mr. Yates believed that Mr. Thompson and Wise "took care" of all the MOX personnel that were directly involved in controlling or administering the Wise Subcontracts by providing gifts and favors, or hiring these employees' relatives.

82.     During the relevant time period, Jamie Morris was a MOX Field Electrical Superintendent and Construction Manager.  In this position, Mr. Morris played a significant role in determining the amount and scope of work MOX subcontracted to Wise.  Mr. Morris was also influential in MOX awarding Wise with its first permanent electrical task order in 2014.  Furthermore, even though he was never appointed as an STR for the Wise Subcontracts, MOX tasked Mr. Morris with confirming the receipt of the materials contained on Wise's invoices.  On numerous occasions, Mr. Morris confirmed the receipt of materials contained on Wise's invoices, including invoices for non-existent materials

83.    From 2013 through 2015, Wise provided Mr. Morris things of value to obtain favorable treatment from MOX.  On some occasions, Mr. Morris specifically detailed the kickback he wanted from Wise, such as football tickets.

84.    Wise believed that it was necessary to provide these items to Mr. Morris in order to receive favorable contract actions from MOX.

85.    Wise gave Mr. Morris college football game tickets on several occasions for University of Alabama football games, including the Virginia Tech vs. Alabama football game on August 31, 2013, the Alabama vs. Auburn University football game on November 4, 2013, and two Alabama games in 2014.   In July of 2014, after MOX awarded Wise a task order to install permanent electrical wire, Mr. Morris asked Mr. Thompson and Wise for tickets and a hotel room for the University of Florida vs. Alabama football game on September 20, 2014.  On July 7, 2014, Mr. Thompson reserved a hotel room for Mr. Morris at the Hilton Garden Inn in Tuscaloosa, AL for $1,147.70.  This hotel room was for Mr. Morris to use when he attended the football game on September 20, 2014.  Mr. Thompson and Wise also purchased football tickets for Mr. Morris to the 2014 Alabama vs. Auburn football game.   On November 14, 2014, Mr. Morris sold these tickets for $1,602.00.  Mr. Thompson and Wise also purchased tickets for Mr. Morris to the Alabama vs. University of Georgia football game on October 3, 2015.  The tickets cost $1,166.00.

86.    Wise also provided Mr. Morris with hunting supplies and a hunting rifle.

87.    From 2009 through 2015, Evelyn Stephens was the MOX Subcontract Administrator for the Wise Subcontracts.  In that role, Ms. Stephens was responsible for the award and administration of the Wise Subcontracts.  As part of her duties, Ms. Stephens

24

coordinated the receipt of Wise invoices, reviewed the invoices for contractual compliance, and forwarded the invoices to MOX's Accounts Payable for payment, including invoices for non-existent materials.  Ms. Stephens was the MOX employee authorized to place and administer the Wise Subcontracts, as well as any modifications or task orders.

88.     From 2010 through 2015, Wise provided Ms. Stephens with things of value in order to obtain favorable treatment from MOX.  Specifically, Wise gave Ms. Stephens a television set, paid for Ms. Stephens's car to be detailed, and paid the union dues in June 2013 for Ms. Stephens' son.  Wise also hired Ms. Stephens's son to work for Wise on the Wise Subcontracts.

89.     From 2009 through 2015, Emily Weigle was the MOX Control Account Manager and was responsible for planning and managing resources such as Wise.  In that time frame, Wise hired Ms. Weigle's son and daughter to work on the Wise Subcontracts.  In her position as the CAM, Ms. Weigle was responsible for providing effective oversight and review of the Wise Subcontracts.

90.     From 2009 through 2015, Jamie Piazza served as one of the MOX STRs for the Wise Subcontracts.  In that position, he was responsible for confirming receipt of material from Wise and approving material invoices.  Wise provided kickbacks to Mr. Piazza in the form of gift cards and Masters Golf Tournament tickets.

91.     From 2009 through 2015, Larry Hull was one of the MOX STRs for the Wise Subcontracts.  In that position, he was responsible for confirming receipt of material from Wise and approving material invoices.  Wise provided kickbacks to Mr. Hull in the form of a firearm.

92.     From 2009 through 2015, Ed Najmola was a MOX Vice President of Construction.  Mr. Najmola requested that Mr. Thompson give him cash to purchase beer for MOX's golf tournaments and to purchase golf clubs to give away as prizes at the same golf tournaments.  Wise believed that it was necessary to give the money and golf clubs to Mr. Najmola for the benefit of Wise.  In June 2014, Mr. Najmola reviewed and approved MOX selection of Wise to perform permanent electrical service installations at the MOX Project.

93.     With respect to the above referenced kickbacks paid by Wise to MOX, Wise included the costs of these kickbacks in the invoices it submitted to MOX under the Wise Subcontracts.   MOX knowingly submitted the costs of these kickbacks to NNSA for payment.

94.     For example, from at least September 2013 through August 2014, Wise and Mr. Thompson told one of the Wise's suppliers, Carolina Sodding Services, LLC, to buy gifts for Wise to use as kickbacks to MOX's employees.  Wise then told Carolina Sodding Services that it wanted to be billed for the cost of the gifts by making it look as if Carolina Sodding Services had provided reimbursable materials for the MOX Project rather than illegal kickbacks.

95.     Mr. Thompson instructed Carolina Sodding Services to create 21 fraudulent invoices, totaling $52,881.20, in order to cover the costs associated with the kickbacks and things of value that Mr. Thompson, on behalf of Wise, provided to various MOX personnel.  To accomplish this aspect of the scheme, Mr. Thompson obtained a blank invoice from Carolina Sodding Services and hand-wrote the quantity, item code, description, price, amount, and the date on the blank invoice.  The materials identified by Mr. Thompson on this invoice were fictional wooden fence posts and various sized lumber, such as 2x4 boards.  He fabricated the amounts to cover Carolina Sodding Services' costs for the illegal gifts.

26

96. Mr. Thompson emailed the handwritten invoice to an employee of Carolina Sodding Services on June 30, 2014, using his MOX Project email address: PSThompson@moxproject.com.

97. The Carolina Sodding Services' employee, in turn, created a false and fraudulent Carolina Sodding Services' invoice using the identical handwritten and fictional information contained within the handwritten invoice Mr. Thompson provided to him. The invoice was dated June 24, 2014 and was numbered 16506. Carolina Sodding Services submitted this invoice to Wise. The invoice was false and fraudulent because it falsely stated it was for materials needed on the subcontract when, in fact, it was to cover the costs of illegal kickbacks that Wise and Mr. Thompson had provided to MOX's employees. Wise, in turn, invoiced MOX with a Wise invoice for the false and fraudulent costs of the kickbacks on July 14, 2014. Wise added a 3% material handling fee to its July 14, 2014 invoice to MOX. On August 4, 2014, MOX submitted a voucher to NNSA and subsequently received payment for its claims that included the false and fraudulent costs associated with this fake invoice from Carolina Sodding Services for the kickbacks.

## VII. MOX KNOWINGLY SUBMITTED 221 FALSE OR FRAUDUELNT CLAIMS TO NNSA

98. As detailed above, Wise submitted 484 false and fraudulent claims to MOX that included fictional costs for materials that were non-existent. MOX, in turn, submitted 221 claims to NNSA that knowingly included the false and fraudulent costs claimed by Wise. These 221 claims are detailed on Attachments 1 to 6 hereto.

99. These 221 MOX claims were knowingly false or fraudulent.

27

100.     If NNSA officials had known the truth about the Defendants' claims for non-existent materials, NNSA would not have paid the claims.  Had NNSA become aware that these 221 claims were for non-existent materials, NNSA would have sought to recover the amounts it paid MOX for these claims.

101.     MOX knowingly submitted these false and fraudulent claims to the NNSA because MOX knew that the claims were for non-existent materials, or acted in deliberate ignorance or reckless disregard of whether the materials existed.

102.     MOX officials involved in approving the Wise's claims and/or submitting them to NNSA knew that Wise had paid kickbacks to MOX in order to improperly reward MOX and to obtain favorable treatment from MOX.

103.     MOX knew that the costs claimed for non-existent materials under each of the Wise Subcontracts identified above, plus administrative costs and fees charged for those non-existent materials, were false or fraudulent because MOX did not administer the Wise Subcontracts in accordance with governmental and contractual regulations and procedures.

104.     MOX knowingly submitted these false and fraudulent claims because it knew that it had not met its contractual obligations to confirm that the material costs claimed by Wise were for materials that actually existed and had been delivered to the MOX Project.  In fact, as described above, the material costs from Wise included in these MOX claims to the NNSA were false and fraudulent because the materials were non-existent and had not been delivered to the MOX Project.  MOX did not comply with its prime contract obligations to ensure the claims were valid before authorizing payment of the Wise claims and submitting those claims to NNSA.

105.    MOX knew that it failed to follow the criteria in its STR Manual and PP10-16 that required MOX to confirm material requisitions prior to authorizing payment of the Wise claims.

106.    Wise included a contractually unallowable 3% material fee in its claims, and MOX approved the claims and submitted them to NNSA in any event.

107.    In 2013, MOX STR Mr. Yates told his supervisors that he was unable to perform his required STR duties, including his duties to confirm that MOX was receiving materials from Wise for use on the MOX Project.  Despite this report by Mr. Yates, MOX did not take any steps to ensure these requirements were being met, including that MOX was actually receiving materials for which Wise charged MOX.

108.    MOX knew that its personnel assigned to the Wise Subcontracts had not taken the required steps to ensure that materials procured by Wise under the Subcontracts, and claimed for reimbursement, satisfied basic FAR Part 31 requirements for allowability.

109.    MOX knew that it received claims for material costs from Wise for non-existent materials on the Wise Subcontracts.  This was not permitted under the express terms of the Wise Subcontracts and should have alerted MOX to the false and fraudulent nature of the Wise claims.

110.    MOX knowingly paid the false and fraudulent claims submitted by Wise, and subsequently billed NNSA for those claims, even though it knew that Wise submitted claims for materials up to 30 days after the material had been allegedly delivered to the MOX Project, which prevented MOX from confirming the delivery.  This was a violation of the Wise Subcontracts and the MOX Contract, and should have led to the claims being rejected or, at very least, subject to additional scrutiny.

111.    The Ross Hardware and AV Security invoices submitted by Wise to MOX were in excess of 30 percent of the total amount of materials associated with the Wise Subcontracts. MOX knowingly ignored red flags on the face of the Ross Hardware and AV Security invoices in that the invoices: (a) were hand-written, (b) did not include shipping fees, and (c) were non-local MOX Project suppliers that were located within 50 miles of Wise's home office in Dayton, Ohio.  The AV Security address listed on the invoices was connected to a residential address in Dayton, Ohio.

112.    MOX also failed to obtain support from Wise that the non-existent materials had been competitively awarded in compliance with the requirements of the Wise Subcontracts.

113.    MOX knowingly paid the false and fraudulent claims submitted by Wise, and subsequently billed NNSA for those claims, even though it knew that Wise had actually forged MOX's approval signatures on some of the supplier invoices it submitted for payment. Specifically, in January 2015, Mr. Yates determined that, after taking several days off work during the Christmas holiday period in 2014, he returned to work and identified several AV Security invoices submitted by Wise that purported to have his initials approving the submission of the claims to NNSA.  Mr. Yates informed MOX's management, including MOX's Construction Procurement Manager Francis Maranda.  Mr. Yates also confronted Wise's Senior Site Representative Mr. Thompson about the forged approval initials.  Mr. Thompson admitted to forging and photocopying Mr. Yates' initials to the invoices.  Mr. Yates and Mr. Thompson then went to the office of Mr. Yates' STR supervisor, Mario Zunino, to report Mr. Thompson's admission to forging Mr. Yates' initials on the invoices.  Mr. Yates, Mr. Thompson, and Mr. Zunino then met with MOX Vice President for Construction Daniel Hosey, to further discuss the

forged invoices.  Mr. Hosey discussed the matter with Mr. Yates involving the forged initials and requested that Mr. Yates retrieve the forged invoices for further review.  After reviewing the forged invoices, Mr. Hosey instructed Mr. Yates to reject the invoices and Mr. Yates complied. Following the meeting with Mr. Hosey, MOX directed that all future material purchases for the Wise Subcontracts must go through MOX procurement department and Wise was no longer allowed to procure and charge for materials under the Wise Subcontracts.

114.    Eventually, in January 2015, MOX's Construction Procurement Manager, Mr. Maranda, contacted MOX's STR Mr. Yates and requested that Mr. Yates verify the materials shown on some Wise invoices for materials from AV Security had been delivered to the MOX Project.  Mr. Yates, in turn, contacted Wise's Senior Site Representative, Mr. Thompson, and told Mr. Thompson to confirm that all of the invoiced material was present.  Mr. Thompson explained to Mr. Yates that verifying the invoices would take some time to complete.  Mr. Yates never received the verification from Mr. Thompson and never approved the invoices.  Instead, Mr. Morris had verified and approved the invoices and MOX charged them to the NNSA even though the materials were non-existent and Mr. Morris was not appointed as an STR on the Wise Subcontracts.

115.    Nonetheless, despite knowing of the forgeries and knowing that its procedures for approving material charges had not been followed, MOX subsequently billed NNSA for the forged invoices.

116.    Following Mr. Yates' discovery that his signature was forged on invoices, coupled with Mr. Thompson's admission that he forged Mr. Yates' signature on these invoices, MOX nevertheless improperly approved, processed, and invoiced NNSA for costs associated

31

with the forged invoices.  MOX approved these invoices even though it did not obtain a required

signature of an STR in the approval process and even though the materials were non-existent.

Moreover, MOX knowingly continued to approve additional invoices for materials from Wise

even after discovery of the forgery and after terminating Wise's material procurement authority.

All of these additional invoices were for materials that were non-existent and had not been

delivered to the MOX Project.  For example, MOX knowingly approved and claimed costs from

NNSA, that were paid by NNSA, for the following false and fraudulent invoices:

(i)      1 false and fraudulent Wise invoice dated June 5, 2015, that included 15 AV

Security invoices totaling $57,637.78, which Wise submitted to MOX for reimbursement and in

turn MOX submitted a claim to NNSA for these costs.

(ii)      2 false and fraudulent Wise invoices dated January 5, 2015 and February 2, 2015,

that included 2 Ross Hardware, Inc. invoices totaling $6,413.01, which Wise submitted to MOX

for reimbursement and in turn MOX submitted claims to NNSA for these costs.

(iii)      14 false and fraudulent Wise invoices with dates ranging between February 2,

2015 and May 11, 2015, that included 27 total Norton Welding invoices totaling $90,991.70,

which Wise submitted to MOX for reimbursement and in turn MOX submitted claims to NNSA

for these costs.

(iv)      2 false and fraudulent Wise invoices dated March 30, 2015 and April 13, 2015,

that included 4 Aiken Electrical Wholesalers, Inc. invoices totaling $11,567.51, which Wise

submitted to MOX for reimbursement and in turn MOX submitted claims to NNSA for these

costs.

(v)      5 false and fraudulent Wise invoices with dates ranging from January 5, 2015 and April 27, 2015, that included 5 Mundy's Automotive invoices totaling $9,590.16, which Wise submitted to MOX for reimbursement and in turn MOX submitted claims to NNSA for these costs.

117.     Although none of the materials in the above-identified invoices were provided to the MOX Project (and did not exist), Mr. Morris, on behalf of MOX, improperly approved the invoices and asserted that the non-existent materials were delivered to, and necessary for, the MOX Project.

118.     MOX did not report the forgeries to NNSA.

119.     Wise Senior Site Representative, Mr. Thompson, remained in the same position that he held prior to the forged invoice events.

<u>**COUNT I**</u>
<u>**(False Claims Act: Presentation of False Claims)**</u>
**(31 U.S.C. § 3729(a)(1) (claims up to and through May 19, 2009)**
**and 31 U.S.C. § 3729(a)(1)(A) (claims from and after May 20, 2009))**
<u>**(Against Defendants MOX and Wise)**</u>

120.     The United States repeats and realleges the allegations contained in Paragraphs 1 through 119 above, as if fully set forth herein.

121.     Defendants MOX and Wise violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented to NNSA false and/or fraudulent claims for payment on MOX Project Contract and the Wise Subcontracts.

122.     The United States paid the false and/or fraudulent claims because of the acts of MOX and Wise and the United States incurred damages as a result.

123.    Pursuant to 31 U.S.C. § 3929(a), Defendants MOX and Wise are jointly and severally liable to the United States for three times the amounts of all damages sustained by the United States because of Defendants' conduct, plus a civil penalty for each violation of the Act.

## COUNT II
### (False Claims Act: False Statements Material to False Claims)
### (31 U.S.C. § 3729(a)(2) (claims up to and through May 19, 2009)
### and 31 U.S.C. § 3729(a)(1)(B) (claims from and after May 20, 2009))
### (Against Defendants MOX and Wise)

124.    The United States repeats and realleges the allegations contained in Paragraphs 1 through 123 above, as if fully set forth herein.

125.    Defendants MOX and Wise violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements that were material to false or fraudulent claims for payment to NNSA.

126.    The United States paid the false and/or fraudulent claims because of the acts of MOX and Wise and the United States incurred damages as a result.

127.    Pursuant to 31 U.S.C. § 3929(a), Defendants MOX and Wise are jointly and severally liable to the United States for three times the amounts of all damages sustained by the United States because of Defendants' conduct, plus a civil penalty for each violation of the Act.

## COUNT III
### For Civil Penalties Under Anti-Kickback Act 41 U.S.C. §§ 8702 and 8706
### (Against Defendants MOX and Wise)

128.    The United States repeats and realleges the allegations contained in Paragraphs 1 through 127 above, as if fully set forth herein.

129.    Defendant MOX violated the Anti-Kickback Act, 41 U.S.C. § 8702, by knowingly soliciting and accepting kickbacks, and by knowingly including the amount of those

34

kickbacks in claims to the NNSA, in order to improperly reward MOX and obtain favorable treatment from MOX and its officials in connection with the Wise Subcontracts.

130.    Defendant Wise violated the Anti-Kickback Act, 41 U.S.C. § 8702, by knowingly offering and providing kickbacks to Defendant MOX and its officials, and by knowingly including the amount of those kickbacks in claims to MOX, in order to improperly reward MOX and obtain favorable treatment from MOX and its officials in connection with the Wise Subcontracts.

131.    Pursuant to 41 U.S.C. § 8706, Defendants MOX and Wise are jointly and severally liable to the United States for a civil penalty in the amount of twice the amount of each kickback involved in each violation, plus an additional civil penalty for each violation.

## COUNT IV
### For Breach of Contract
### (Against Defendant MOX)

132.    The United States repeats and realleges the allegations contained in paragraphs 1 through 131, as if fully set forth herein.

133.    Without excuse, Defendant MOX materially breached its contract with NNSA by: (1) charging inflated, unallowable, and unreasonable costs associated with the Wise Subcontracts; (2) soliciting and accepting kickbacks from Wise in return for improperly providing Wise with favorable treatment with respect to the Wise Subcontracts; (3) charging the NNSA for unreasonable and unallowable subcontractor fees in violation of contractual and regulatory provisions; and (4) billing the NNSA for purported material costs that were not delivered to the MOX Project.

134.    As a result of these breaches of contract the United States has been damaged.

## COUNT V
### For Unjust Enrichment
### (Against Defendant Wise)

135.    The United States repeats and realleges the allegations contained in paragraphs 1 through 134 as if fully set forth herein.

136.    By receiving inflated, unreasonable, and unallowable payments and fees from MOX which were funded by NNSA, by making and using false records and statements, by offering and paying kickbacks, and through its wrongful, improper, and corrupt conduct, Defendant Wise Service has been unjustly enriched and is liable to repay such amounts to the United States.

## COUNT VI
### For Payment by Mistake
### (Against Defendants MOX and Wise)

137.    The United States repeats and realleges the allegations contained in paragraphs 1 through 136, as if fully set forth herein.

138.    As a result of Defendants' conduct, the NNSA made payments to MOX, which in turn paid Wise, under the mistaken belief that the materials charged were supplied to the MOX Project.

139.    This mistaken belief was material to the NNSA payments to MOX, and in turn to Wise.

140.    Had NNSA become aware that the materials charged by MOX and Wise did not exist, NNSA would have sought to recover all amounts paid for the non-existent materials.

141.    MOX and Wise are liable to the United States for the amounts paid to MOX, and in turn to Wise, by the United States as a result of this mistake.

36

## **PRAYER FOR RELIEF**

142.    Plaintiff the United States of America prays for judgment against the Defendants, as follows:

A.    As to Counts I and II under the False Claims Act, 31 U.S.C. § 3729(a), against Defendants MOX and Wise jointly and severally, for treble the amount of the United States' single damages to be proven at trial, plus civil penalties as are required by law in the amount of $11,181 and not more than $22,363 per violation of the False Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

B.    As to Count III under the Anti-Kickback Act, 41 U.S.C. §§ 8702, 8706, against Defendants MOX and Wise jointly and severally, civil penalties double the amount of the kickbacks, plus additional civil penalties of not more than $22,363 per instance of prohibited conduct under the Anti-Kickback Act, and such other relief as may be necessary and proper;

C.    As to Count IV, breach of contract, against Defendant MOX, for the amount of damages sustained by the United States as a result of MOX's breaches of contract, to be proven at trial, plus pre-judgment and post-judgment interest, and costs;

D.    As to Count V, unjust enrichment, against Defendant Wise, for the sums by which Defendant Wise has been unjustly enriched, to be proven at trial, plus pre-judgment and post-judgment interest, and costs;

E.    As to Count VI, payment by mistake, against Defendants MOX and Wise, for the amounts paid to MOX and Wise by mistake, to be proven at trial, plus pre-judgment and post-judgment interest, and costs; and

F.    Such other relief as the Court deems just, necessary, and proper.

37

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

SHERRI A. LYDON
United States Attorney

By: s/James C. Leventis, Jr.
JAMES C. LEVENTIS, JR. (#9406)
Stanley D. Ragsdale (#3197)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, S.C. 29201
Telephone (803) 929-3000
James.Leventis@usdoj.gov

Michael D. Granston
Robert McAuliffe
Don Williamson
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044

Dated: February 14, 2019